UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PROFI-PARKIET SP. ZOO,

                 Plaintiff,                            **REPORT AND RECOMMENDATION**
                                                                **13 CV 4358 (PKC)(LB)**

    -against-

SENECA HARDWOODS LLC,

                 Defendant.
------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

       Plaintiff Profi-Parkiet Sp. Zoo ("Profi-Parkiet") brings this breach of contract action pursuant to the United Nations Convention on Contracts for the International Sale of Goods ("CISG") against Seneca Hardwoods LLC ("Seneca"), a New York-based manufacturer of hardwood floors, alleging that Seneca breached the terms of a sales agreement by providing wooden planks that did not conform to the parties' agreed-upon specifications. Despite proper service of the summons and complaint, defendant failed to plead or otherwise defend this action. On November 4, 2013, the Clerk noted defendant's default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. Plaintiff now moves for a default judgment pursuant to Rule 55(b) of the Federal Rules of Civil Procedure. The Honorable Pamela K. Chen referred plaintiff's motion to me for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, it is respectfully recommended that plaintiff's motion for a default judgment should be granted in part and denied in part, and the Court should enter judgment for plaintiff in the amount of $52,537.07, plus pre-judgment as set forth herein.

## BACKGROUND

       Profi-Parkiet is a limited liability company registered and licensed to do business in the Republic of Poland, with its principal place of business in Warsaw, Poland. See Compl. ¶¶ 1-

1

2. Plaintiff's primary business involves the wood trade, including the sale of wood floor panels, machine sales for woodworking, wood glues and chemicals, and general woodwork and masonry products. Id. ¶ 4. A portion of plaintiff's business also entails purchasing wood products from companies in the United States and reselling those products in the European market. Id. ¶ 5.

During the spring of 2011, plaintiff's representatives traveled from Poland to the U.S. to seek wood suppliers. Id. ¶ 9. On or about May 12, 2011 plaintiff entered into a sales agreement with Seneca, a New York based manufacturer of unfinished solid hardwood floors with its principal place of business in Odessa, New York. Id. ¶¶ 6-7, 11. The agreement, which was drafted with input from both plaintiff and defendant over the course of several email communications, set forth terms for the sale of Walnut Select and Better Grading ("S&B") 5¼" Tongue and Groove ("T&G") wood. Id. ¶¶ 12-13. Defendant agreed to supply 5,100 square feet of wood at approximately $3.87 per square foot, to be shipped to plaintiff through a third party, for a total cost of $20,487.98. Id. ¶¶ 15, 30; Compl. Ex. at 30.[1] Plaintiff wired $16,390.38, representing an eighty percent down payment, to defendant on May 12, 2011 to reserve the lumber and agreed to wire the final twenty percent payment after receiving and inspecting the product. Id. Plaintiff also agreed to cover the cost of shipping. Id.

On July 29, 2011 defendant informed plaintiff that shipment was delayed because the boxes required for packaging the product would not be available until August 12, 2011. Compl. Ex. at 38-39. On September 16, 2011, defendant notified plaintiff that shipment was further delayed due to a rise in the cost of raw material and that a shipment date would be set at a later time. Id. at 40. On October 19, 2011, plaintiff emailed a "final warning" to defendant

---

[1] Although the Complaint refers to Exhibits A through G, the documents attached to the Complaint are not designated as separate exhibits. Accordingly, the Court refers to the ECF page numbers cited as "Compl. Ex." herein.

demanding immediate shipment or a refund of the down payment. Id. at 41. Defendant responded on November 11, 2011, asking that plaintiff agree to a modification in the order. Specifically, defendant asked whether plaintiff was willing to accept smaller pieces of lumber than plaintiff originally requested.[2] Plaintiff agreed to the changes. Id. at 47. Defendant informed plaintiff approximately two weeks later that the down payment already made would satisfy plaintiff's payment obligation. Id. at 46 ("We are basing the monies given as the full amount.").

In December 2011, the shipment arrived at plaintiff's facility in Warsaw, Poland. Compl. ¶ 18. After inspecting the contents of the shipment, plaintiff concluded that the wood did not conform to the terms of the order. Specifically, plaintiff asserts that the shipment violated the parties' agreement because (1) the flooring pieces were approximately one foot long, when plaintiff had ordered planks ranging from 18" to seven feet, with an average length of four feet; (2) the planks were not "tongue-and-groove" finished, as ordered; (3) the planks were cracked and split, and were therefore not in accordance with S&B grading, (4) the planks were discolored, and (5) there was approximately 313 square feet of flooring missing from the shipment. Id. ¶ 20; see also Compl. Ex. at 60. In an email dated February 22, 2012, plaintiff informed defendant that plaintiff did not accept the goods and demanded that defendant retrieve the goods, refund the payment, and reimburse all expenses incurred as a result of the shipment. Compl. ¶ 22; see also Compl. Ex. at 60.

Defendant responded in a February 23, 2012 email apologizing for plaintiff's dissatisfaction, but stating that the "product was sent to you as agreed upon." Compl. Ex. at 61.

---

[2] The emails exchanged reflect that plaintiff agreed to receive both 5 ¼" and 4 ¼" wide flooring made of black walnut select wood. See Compl. Ex. at 42. Defendant confirmed and plaintiff agreed that the shipment would contain 160 bundles of 5 ¼" wide pieces and 80 bundles of 4 ¼" wide pieces. Defendant also informed plaintiff that the cost of boxes to ship the product was "a lot more" than expected. Id.

3

Defendant also denied responsibility for any damages occurring "[o]nce the product was out of our custody and control." Id. On March 5, 2012, defendant offered plaintiff, "in the spirit of good will . . . a credit towards future purchase of any species EXCEPT Black Walnut." Id. at 64 (emphasis in original).

By letter dated June 18, 2012, plaintiff's attorney reiterated plaintiff's demand for a refund and informed defendant that plaintiff intended to initiate legal proceedings. Compl. ¶ 29; Compl. Ex. at 72-73. Defendant did not respond to this letter. Compl. ¶ 30.

## PROCEDURAL HISTORY

Plaintiff filed this action on August 1, 2013, alleging breach of contract and other related claims. Defendant was served on August 6, 2013; its answer was due on August 27, 2013. ECF No. 4. When defendant did not respond to the Complaint, plaintiff requested a Certificate of Default on November 4, 2013 pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. ECF No. 5. The Clerk of Court entered a default on November 4, 2013. ECF No. 7. On March 7, 2014, plaintiff moved for default judgment pursuant to Rule 55(b) of Federal Rules of Civil Procedure. ECF No. 8. The Honorable Pamela K. Chen referred plaintiff's motion to me for a Report and Recommendation in accordance with 28 U.S.C § 636(b). See Order dated Mar. 12, 2014.

## DISCUSSION

### I. Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction and may only entertain disputes as specifically authorized by the Constitution or statute." Genpharm Inc. v. Pliva-Lachema A.S., 361 F.Supp.2d 49, 53 (E.D.N.Y. 2005) (citing Kokkonen v. Guardian Life Ins. Co. of Amer., 511 U.S. 375, 377 (1994)). As such, courts "may examine subject matter jurisdiction, *sua sponte*, at any stage of the proceeding." Adams v. Suozzi, 433 F.3d 220, 224 (2d Cir. 2005).

Pursuant to 28 U.S.C. § 1331, federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiff alleges that "[t]his Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as the matter asserts claims arising under the laws of the United States," but does not specify the law conferring jurisdiction.[3]

Although the majority of the claims asserted in the Complaint are state law causes of action arising from defendant's alleged breach of contract, plaintiff also brings a claim under the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). See CISG, 19 I.L.M. 668 (1980). "The CISG is an international treaty[4] that governs the formation of international sales contracts as well as the rights and obligations of the parties. Ratified by the Senate in 1986, the CISG is a self-executing treaty that creates a private right of action in federal court." Genpharm, 361 F.Supp.2d at 54; see also United Nations Comm'n on Int'l Trade Law (UNCITRAL), Status: 1980 United Nations Convention on [CISG] 2005, at http://www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/1980CISG_status.html (last visited May 23, 2014) (listing the parties to the CISG, including the United States and Poland); Stawski Dist. Co., Inc. v. Zywiec Breweries PLC, No. 02 C 8708, 2003 WL 22290412, at *2 (N.D. Ill. Oct. 6, 2003) (noting that "both Poland and the United States have ratified the [CISG]").

---

[3] Although plaintiff also alleges that this Court has jurisdiction under 28 U.S.C. § 1332 due to the parties' diversity of citizenship and a "matter of controversy exceed[ing] the sum or value of 75,000 USD," see Compl. ¶ 41, the supporting materials submitted in connection with the instant motion for default judgment do not establish definitively that the amount in controversy meets the statutory threshold required for diversity jurisdiction. See ECF No. 8; see also section IV.A., infra. "Although the party invoking federal jurisdiction must show by a reasonable probability that the amount-in-controversy requirement is satisfied, [courts in this Circuit] recognize a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." Colavito v. New York Organ Donor Network, Inc., 438 F.3d 214, 221 (2d Cir. 2006) (internal quotations omitted). However, because this Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331, the Court need not resolve the question of whether the amount in controversy alleged suffices to confer diversity jurisdiction under 28 U.S.C. §1332.

[4] The ratified document states in part that the Convention "will apply to sales contracts between parties with their places of business in different countries bound by Convention, provided the parties have left their contracts silent as to applicable law." See U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods: Official English Text, Mar. 2, 1987, 52 FR 6262-02.

While there are few cases discussing claims arising under the CISG, the available case law establishes both that federal district courts have subject matter jurisdiction over such claims, and that plaintiff's claims here are encompassed by the CISG. See, e.g., Genpharm, 361 F. Supp. 2d at 54 (noting that "[t]here are only a handful of American cases interpreting the CISG," but finding that a dispute "involv[ing] an agreement to supply goods . . . falls within this Court's treaty jurisdiction, and this Court's subject matter jurisdiction"); see also Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1027 (2d Cir. 1995) (affirming applicability of CISG to dispute involving sale of compressors to Italian manufacturer of air conditioners); Hanwha Corp. v. Cedar Petrochemicals, Inc., 760 F. Supp. 2d 426, 430 (S.D.N.Y. 2011) ("As a treaty, the CISG is a source of federal law."); Geneva Pharms. Tech. Corp. v. Barr Labs, Inc., 201 F.Supp.2d 236, 281 n.26 (S.D.N.Y. 2002) ("Because the alleged sales contract involves international trade, [plaintiff's] claims must be analyzed according to the provisions of the [CISG]."), rev'd on other grounds, 386 F.3d 485, 489 (2d Cir. 2004).

## II.    Rule 55

Rule 55 of the Federal Rules of Civil Procedure establishes the two-step process for a plaintiff to obtain a default judgment. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, after a default has been entered against a defendant, and the defendant fails to appear or move to set aside the default under Rule 55(c), the Court may, on a plaintiff's motion, enter a default judgment. Fed. R. Civ. P. 55(b)(2). In light of the Second Circuit's "oft-stated preference for

resolving disputes on the merits," default judgments are "generally disfavored." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). "Accordingly, just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." Mktg. Devs., Ltd. v. Genesis Imp. & Exp., Inc., No. 08-cv-3168, 2009 WL 4929419, at *6 (E.D.N.Y. Oct. 6, 2009) (citing Erwin DeMartino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993)). In considering a motion for a default judgment, the Court has substantial discretion to weigh factors such as "whether the grounds for default are clearly established, and the amount of money potentially involved." Id. (noting "the more money involved, the less justification for entering the default judgment"); see also Clinton v. Oppenheimer & Co., Inc., 824 F.Supp.2d 476, 487 (S.D.N.Y. 2011) ("[T]he court may consider numerous factors, including whether plaintiff has been substantially prejudiced by the delay involved . . . and how harsh an effect a default judgment might have on the defendant.") (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2685 (3d ed. 1998))).

Once a default has been entered, the Court "deems all the well-pleaded allegations in the pleadings to be admitted." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (2d Cir. 1997). Accordingly, on a motion for default judgment, the Court "is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor." Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)). However, in determining whether to issue a default judgment, the Court has the "responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief." Rolls-Royce plc v. Rolls-Royce USA, Inc., 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010). In other words, "[a]fter default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of

7

action, since a party in default does not admit conclusions of law." Id.

III. **Plaintiff's Causes of Action**

A. Breach of Contract[5]

Although plaintiff's complaint alleges breach of contract pursuant to both the CISG and the Uniform Commercial Code, "[f]or international contracts for the sale of goods between U.S. parties and foreign parties . . . concluded on or after 1 January 1989, the applicable commercial law is not the U.C.C., but rather, the [CISG] . . . unless the parties expressly contract out of the Convention's coverage."[6] Orbisphere Corp. v. United States, 726 F.Supp. 1344, 1355 n.7 (Ct. Int'l Trade 1989). The U.C.C. may "inform a court where the language of the relevant CISG provisions tracks that of the U.C.C. However, U.C.C. case law is not *per se* applicable" to all sale of goods contract disputes. Genpharm, 361 F.Supp.2d at 55. Accordingly, the Court will evaluate plaintiff's breach of contract claim under the CISG.

"Because case law interpreting the CISG is relatively sparse, th[e] Court is authorized to interpret it in accordance with its general principles, with a view towards the need to promote uniformity in its application and the observance of good faith in international trade." Hanwha Corp., 760 F.Supp.2d at 430. "Under the CISG, '[t]he seller must deliver goods which are of the quantity, quality and description required by the contract,' and 'the goods do not conform with the contract unless they . . . are fit for the purposes for which goods of the same description

---

[5] In addition to the breach of contract claim, plaintiff's complaint alleges a cause of action for each of the following: breach of implied equitable indemnity; breach of express warranty; and breach of implied warranty of merchantability. Because these claims are subsumed in plaintiff's breach of contract claim, the Court need not address them individually.

[6] "Generally, the CISG governs sales contracts between parties from different signatory countries. However, the Convention makes clear that the parties may by contract choose to be bound by a source of law other than the CISG, such as the Uniform Commercial Code." Delchi Carrier, 71 F.3d at 1031. Moreover, if the agreement is "silent as to choice of law, the [CISG] applies if both parties are located in signatory nations." Id. (citing CISG art. 1).

8

would ordinarily be used.'" Chicago Prime Packers, Inc. v. Northam Food Trading Co., 320 F. Supp. 2d 702, 709 (N.D. Ill. 2004) (quoting CISG, art. 35), aff'd, 408 F.3d 894 (7th Cir. 2005). "The CISG further states that '[t]he seller is liable in accordance with the contract and this Convention for any lack of conformity.'" Id. (quoting CISG, art. 36). The buyer's obligation under the Convention requires that the buyer give notice to the seller of any lack of conformity within a reasonable time "after he has discovered it or ought to have discovered it." Id. (quoting CISG, art. 39). Furthermore, the Convention states that a breach of contract is fundamental when "it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstances would not have foreseen such a result." Delchi Carrier, 71 F.3d at 1028 (quoting CISG, art. 25).

Here, the complaint establishes that an enforceable contract was formed between plaintiff and defendant. The emails exchanged between the parties set the quantity, quality, type and price of the wood product to be transferred; the invoice defendant sent to plaintiff memorialized these terms, and included terms regarding payment and shipping. Compl. Ex. at 30. Plaintiff alleges that defendant failed to deliver the goods as promised, and alleges that the product plaintiff received did not conform to the quantity, quality or description of the goods purchased. Moreover, plaintiff rejected the wood within a reasonable time after the goods were delivered to plaintiff. See Compl. Ex. at 60; CISG art. 38(2) ("[i]f the contract involves carriage of the goods, examination may be deferred until after the goods have arrived at their destination.").

Accordingly, plaintiff has adequately alleged that the parties' contract is governed by the CISG, that defendant failed to perform under the contract, and that plaintiff rejected the goods

in a timely fashion. See, e.g., Delchi Carrier, 71 F.3d at 1029 ("[A]ny reasonable person could foresee that shipping non-conforming goods to a buyer would result in the buyer not receiving that which he expected and was entitled to receive."). Because plaintiff has pled the elements of a breach of contract claim under the CISG, plaintiff's motion for a default judgment against defendant should be granted.[7]

  B.  Unjust Enrichment

In addition to breach of contract claims, plaintiff's complaint alleges that defendant was unjustly enriched as a result of the transaction. "To recover on a theory of unjust enrichment a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff." Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983). A claim for unjust enrichment does not center on the existence of an agreement; instead, it "is a non-contractual, equitable remedy that is inapplicable if there is an enforceable contract governing the subject matter." Newman v. Mor, 73 Fed. R. Serv. 3d 103 (E.D.N.Y. 2009) (citing R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 60 (2d Cir. 1997)).

Plaintiff's claim for unjust enrichment is based upon its contract with defendant. Because that contract governs the parties' responsibilities and entitlements, plaintiff's motion for a default judgment on its unjust enrichment cause of action should be denied.

---

[7] The Court would reach the same result under the provisions of the U.C.C. The U.C.C. specifies that a breach of contract occurs when "the goods or the tender fail in *any* respect to conform to the contract." N.Y. U.C.C. Law § 2-601 (McKinney 2014) (emphasis added); see also N.Y. U.C.C. Law § 2-106 (McKinney 2014) (noting U.C.C. "policy [] requiring exact performance by the seller of his obligations as a condition to his right to require [the buyer's] acceptance" of those goods). "To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Mayflower Transit, LLC v. Colvin, No. 11-cv-663, 2011 WL 4975793, at *3 (E.D.N.Y. Sept. 20, 2011) (quoting Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004)). Plaintiff's allegations, accepted as true, adequately state a cause of action for breach of contract under the U.C.C.

C. Deceptive Business Practices

Plaintiff further alleges that defendant's misrepresentations and omissions constituted "unfair and deceptive practices . . . in the course of conducting trade or commerce." See Compl. ¶¶ 64, 67. Although plaintiff does not specify a statutory basis for this cause of action, the Court construes this claim to arise under New York's General Business Law, which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." See N.Y. Gen. Bus. Law § 349 (McKinney 2014). Section 349 requies a plaintiff to prove that "(1) the challenged act or practice was consumer oriented; (2) the act or practice was misleading in a material way; and (3) the plaintiffs suffered injury as a result of the deceptive act." Silverman v. Household Finance Realty Corp. of New York, --- F.Supp.2d ----, 2013 WL 4039381, at *2 (E.D.N.Y. Aug. 5, 2013) (citing Lebowitz v. Dow Jones & Co., 508 Fed. Appx. 83, 85 (2d Cir. 2013)). "The gravamen of such a claim is that the offending conduct be directed against the consuming public, and not a 'single-shot transaction' or between sophisticated corporate parties." Id.; see also Diaz v. Paragon Motors of Woodside, Inc., 424 F.Supp.2d 519, 542 (E.D.N.Y. 2006) ("Private contract disputes, unique to the parties, or 'single-shot transactions' would not fall within the ambit of the statute.").

Section 349 is not applicable to the instant contract dispute because plaintiff does not allege more than a "single-shot transaction." Therefore, plaintiff's motion for a default judgment on its deceptive practices claim should be denied.

D. Tort Claims

Plaintiff's final causes of action are tort claims. Specifically, plaintiff claims that defendant negligently misrepresented the standard of wood it sold to plaintiff and negligently interfered with plaintiff's prospective economic advantage. See Compl. ¶¶ 96-117.

It is axiomatic that "[a] tort action may accompany one for breach of contract only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is breached." Tevadorachvili v. Chase Manhattan Bank, 103 F.Supp.2d 632, 643 (E.D.N.Y. 2000) (citing Luxonomy Cars, Inc. v. Citibank, N.A., 408 N.Y.S.2d 951, 954 (2d Dep't 1978); see also Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 725 F. Supp. 656, 662 (N.D.N.Y. 1989) ("As a general rule . . . the breach of a contract is not actionable in tort in the absence of special additional allegations of wrongdoing which amount to a breach of a duty distinct from, or in addition to, the breach of a contract.") (internal quotation marks and citation omitted)). It is also well-established that "[n]egligence actions which seek recovery for purely economic loss, as opposed to damages for injury to person or property, are generally not cognizable in New York." Niagara Mohawk Power Corp., 725 F. Supp. at 661.

Simply stated, plaintiff's claims here sound in contract, not in tort. Plaintiff does not allege a relationship or duty independent of its contractual relationship with defendant. Moreover, plaintiff seeks recovery only for the economic losses it suffered as a result of defendant's alleged breach of that contract. Accordingly, plaintiff's motion for a default judgment should be denied on plaintiff's negligence-based claims.[8]

For the foregoing reasons, I respectfully recommend that plaintiff's motion for default judgment on its breach of contract claim should be granted and should be denied for all other claims.

---

[8] Similarly, plaintiff's motion for a default judgment on its claim for negligent interference with prospective economic advantage should be denied. "[R]ecovery of damages for tortious interference with prospective economic advantage must be based on a factual showing that: (1) the plaintiff had business relations with a third party; (2) the defendants interfered with those business relations; (3) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendants' acts injured the relationship." Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002). In addition, the allegations must establish that the defendant interfered with "business relations existing between the plaintiff and a third party, [] with the sole purpose of harming the plaintiff . . . ." PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir. 1987). Here, although plaintiff alleges that it was contractually obligated to provide the wood it bought from defendant to other companies, and that those "companies lost confidence in plaintiff's ability to provide satisfactory products" as a result of defendant's breach of contract, plaintiff does not allege the other elements of a tortious interference claim.

**IV.     Damages**

"[I]t is well established that 'while a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.'" Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012) (quoting Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992)). The Court is not required to hold a hearing to determine damages, as "[d]etailed affidavits and other documentary evidence can suffice in lieu of an evidentiary hearing." Chanel, Inc. v. Louis, No. 06-cv-5924, 2009 WL 4639674, at *4 (E.D.N.Y. Dec. 7, 2009) (citing Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991)). On a motion for default judgment, a plaintiff has the burden to prove damages to the Court with a "reasonable certainty." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citation omitted).

"The general rule for measuring damages for a breach of contract is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." Mayflower Transit, 2011 WL 4975793 at *3. "Where plaintiff has filed reasonably detailed materials . . . pertaining to the damages incurred, and defendant has failed to make an appearance, or otherwise respond and present evidence on the issue of damages, the Court is able to make an informed recommendation regarding damages." Finkel v. Univ. Elec. Corp., No. 12-cv-2154, 2013 WL 4522594, at *10 (E.D.N.Y. Aug. 27, 2013).

   A.     CISG Provisions

Pursuant to the breach of contract claim arising under the CISG, plaintiff seeks recovery for its actual loss, lost profits and consequential damages. The CISG states that where a seller fails to perform any of his obligations under a contract, the buyer may pursue an award for

13

damages. See CISG art. 45 (1)(b).

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

CISG art. 74. This provision is "designed to place the aggrieved party in as good a position as if the other party had properly performed the contract." Delchi Carrier, 71 F.3d at 1029 (internal quotation marks and citation omitted).

Plaintiff has presented proof of a May 12, 2011 wire payment to Seneca in the amount of $16,390.38. See ECF 10-1. This payment reflects the eighty percent down payment required by the invoice sent from defendant to plaintiff. Id. Plaintiff also asserts that it should recover for the costs relating to shipment and transport of the hardwood, and has included receipts and invoices of those costs: from within the U.S., $350 (ECF No. 10-2); from the U.S. to Poland, $4,319.92 (ECF No. 10-3); and from port in Poland to plaintiff's warehouse, $1,171.46 (ECF No. 10- 5); a total of $5,841.38.[9] See also ECF No. 8-5, Aff. in Supp. of Mot. for Default Judgment ("Pl.'s Affirmation") (applying conversion rate of 1 PLN = 0.30 USD). Plaintiff further alleges that as a result of the defendant's breach, it paid for goods that cannot be used for any purpose.

Because the email communications between defendant and plaintiff show that plaintiff assumed responsibility for the cost of transporting the goods from the defendant's place of

---

[9] Where plaintiff provides the costs incurred in Polish Zloty, the Court converts these amounts into U.S. Dollars using the currency conversion rate in effect on the date of the Report and Recommendation, when 1 PLN = 0.33 USD. See http://www.bloomberg.com/quote/PLNUSD:CUR (last visited May 23, 2014); see also Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F.Supp.2d 397, 408-09 (S.D.N.Y. 2003) (noting that federal courts sitting in diversity "must apply the currency conversion rule employed by the courts of New York. New York courts have adopted the 'judgment day' rule, which mandates conversion based on the exchange rates as of the date of judgment."). Notably, one federal court addressing conversion rates in the context of the CISG upheld a district court's use of the rate "as of the date [plaintiff] learned of the problems with [defendant's shipment,]" noting in an unreported decision that, because "[t]here is no clear resolution of this issue that is dictated by the CISG" the court's "decision to use the exchange rate as the date of breach was not an abuse of discretion." Schmitz-Werke GmbH + Co. v. Rockland Indus., Inc., 37 Fed. Appx. 687, 694 (4th Cir. 2002).

business to the plaintiff's warehouse in Poland, defendant knew or ought to have known of these costs. The Court concludes that plaintiff's loss related to the cost of transporting the nonconforming wood is adequately supported by the record.

In addition to the loss incurred as a result of the nonconforming goods and transport costs, plaintiff asserts that it should recover for port fees associated with the shipment. Plaintiff has presented documents and receipts that reflect demurrage charges of $168.02 (ECF No. 10-4) and charges for the unloading of goods amounting to $811.80 (ECF No. 10-6). Accordingly, plaintiff should be granted default judgment against the defendant for the cost of the non-conforming goods as well as shipment, transport, and port fees in the total amount of $23,211.58.

Plaintiff also claims that the rejected goods continue to be stored in a warehouse where fees are incurred at approximately $7.90 per day. ECF No. 10 at ¶ 11. The CISG provides that "if goods dispatched to the buyer have been placed at his disposal at their destination and he exercises the right to reject them, he must take possession of them on behalf of the seller ...." CISG art. 86(2). Additionally, "[a] party who is bound to take steps to preserve the goods may deposit them in a warehouse of a third person at the expense of the other party provided that the expense incurred is not unreasonable." CISG art. 87. Plaintiff submitted an invoice for warehouse and storage fees from February 7, 2012 to September 9, 2013, which reflects a charge of $6,131.52. ECF No. 10-7. Additional storage fees from September 9, 2013 to present, at the rate of $7.90 per day, equal $2,187.90; therefore, plaintiff should be awarded $8,319.42 for the cost of storing the non-conforming goods on behalf of defendant.

The CISG also allows for damages where "the buyer has bought goods in replacement" of contracted goods "in a reasonable manner and within a reasonable time *after* the breach." CISG art. 75 (emphasis added). This party "may recover the difference between the contract

price and the price in the substitute transaction." Id. Plaintiff claims that it bought goods to replace the non-conforming goods from two separate companies, and submits two invoices in support of this claim for damages. The first invoice, from Mullican Flooring dated July 26, 2011, reflects a total due of $51,493.40. See ECF Nos. 10-8, 10-9. Plaintiff's Complaint states that the breach was discovered by plaintiff upon inspection of the goods on or about February 2012. Accordingly, plaintiff could not have replaced goods that it was unaware were deficient before February 2012. For this reason, plaintiff is not entitled to recover the cost of materials paid to Mullican Flooring months before plaintiff allegedly discovered the deficiencies in defendant's shipment.

The second invoice, from Exo Trade Sp. z.o.o ("Exo Trade") dated September 17, 2012, reflects a charge of $37,396.45 for North American Walnut plank flooring. ECF No. 10-10. Plaintiff's final communication with defendant regarding the non-conforming hardwood occurred on June 18, 2012. Within three months of that communication, plaintiff alleges, it replaced the non-conforming wood with goods from Exo Trade. The difference between the price paid to Seneca ($16,390.38) and plaintiff and the replacement cost ($37,396.45) for hardwood between Exo Trade and plaintiff is $21,006.07. Thus, plaintiff should be granted replacement costs in the amount of $21,006.07.

Finally, plaintiff seeks recovery for lost profits because plaintiff was unable to fulfill business obligations to third parties in Poland as a result of the breach. See Compl. ¶ 35. Plaintiff claims that customers cancelled orders because of the unavailability of materials ordered from defendant, with a total loss in sales of approximately $36,210.78. See ECF 10 ¶ 17; ECF 10-13 at 2-3. "The CISG requires that damages be limited by the familiar principle of foreseeability established in Hadley v. Baxendale, 156 Eng.Rep. 145 (1854)." Delchi Carrier, 71 F.3d at 1029. Based upon the facts alleged here, it was foreseeable that the hardwood ordered

from defendant was expected to be sold to consumers in the European market at the time of contract formation entitling plaintiff to lost profits.

"[T]he standard formula to calculate lost profits is 'to deduct only variable costs from sales revenue ... because [] fixed costs would have been encountered whether or not the breach occurred.'" TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00 Civ. 5189, 2006 WL 2463537, at *12 (S.D.N.Y. Aug. 23, 2006) (quoting Delchi Carrier, 71 F.3d 1024 at 1029). The cancelled invoices filed by plaintiff accurately reflect that customer orders were placed on December 12, 2012 and January 1, 2012 for Walnut S&B hardwood with an order completion date of February 20, 2012; however, plaintiff has provided no documents or estimate as to the costs – either variable or fixed – associated with these potential sales. In the absence of this information, the Court cannot calculate with reasonable certainty either the variable costs that would have been incurred had those sales been completed or the lost profits to the plaintiff. Accordingly, plaintiff's request for lost profits should be denied on the instant record.[10]

In summary, I recommend that plaintiff be awarded $23,211.58 for loss incurred as a result of payment for and shipment of the non-conforming hardwood; $8,319.42 for the cost of storing the wood on behalf of defendant; and $21,006.07 for replacement costs incurred as a result of the breach – a total of $52,537.07.

B. Interest, Attorney's Fees and Costs

The CISG provides that "[i]f a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under article 74." CISG, art. 78. Because defendant failed to pay the sum owed for the non-conforming hardwood, plaintiff is entitled to prejudgment interest. See Delchi

---

[10] Plaintiff may seek reconsideration on this ground by providing supplemental documentation, together with an accompanying English translation, establishing the variable costs associated with these lost sales within the time to file objections.

17

Carrier, 71 F.3d at 1027 (affirming award of prejudgment interest under CISG article 78); Chicago Prime Packers, 320 F.Supp.2d at 715.

> Article 78 does not specify the rate of interest to be applied or how the rate should be determined; . . . [and] because there is no single approach used by all courts and the [plaintiff has] failed to address the interest issue or provide information necessary to 'customize' a rate, this [C]ourt will award interest according to the principles used by federal courts in determining choice of law issues.

Id. at 715-16. "While New York law provides for a 9 percent annual rate of interest, see N.Y.C.P.L.R. § 5004, when a judgment is based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills [] for . . . the relevant time period between the time plaintiff's claims arose . . . until the entry of judgment." Liberty Media Corp., LMC v. Vivendi Universal, S.A., No. 03 Civ. 2175, 2013 WL 105776, at *4 (S.D.N.Y. Jan. 9, 2013). Accordingly, plaintiff is entitled to recover pre-judgment interest on its damages of $52,537.07, starting from February 2012, when plaintiff received the non-conforming goods, using the average rate of return on one-year Treasury bills, compounded annually.

Plaintiff also seeks to recover attorney's fees and costs resulting from litigation. "There is no question that, absent a contractual provision for fees, a prevailing plaintiff cannot recover those expenses on a contract breach claim." Quanzhou Joerga Fashion Co., Ltd. v. Brooks Fitch Apparel Group, LLC, No. 10 Civ. 9078, 2011 WL 4063344, at *8 (S.D.N.Y. Aug. 11, 2011) ("[the] American Rule presumes that a prevailing party may not collect attorney's fees unless otherwise authorized by a specific contractual term, statute or court rule."); see also MODERN LAW OF CONTRACTS § 23:8: *Topics not covered by the CISG* (2014) (stating that "[a]bsent a fee-shifting provision in the contract, the domestic (American) rule against fee-shifting will apply."). Additionally, courts have found that "the term 'loss' in Article 74 of the CISG does not include attorney's fees incurred in the litigation of a suit for

18

breach of contract." Chicago Prime Packers, 320 F.Supp.2d at 717 (citing Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc., 313 F.3d 385, 389 (7th Cir. 2002)); see also Quanzhou Joerga, 2011 WL 4063344, at *1 n.1 ("[P]laintiff asserted a claim for attorney's fees . . . based on its contention that such an award was authorized by the [CISG]. We note that the few federal court decisions that have addressed the question of whether [attorney's] fees are recoverable under the [CISG] have rejected this reading . . . .").

In the present action the email exchanges between the parties make no mention of attorney's fees resulting from litigation. Thus, attorney's fees should not be awarded.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiff's motion for a default judgment against defendant should be granted on plaintiff's breach of contract claim pursuant to the CISG, and denied on all other claims. I further recommend that plaintiff should recover a sum of $52,537.07 for loss incurred as a result of the breach, plus pre-judgment interest dating from February 2012, using the average rate of return on one-year Treasury bills, compounded annually. Plaintiff shall serve a copy of this Report and Recommendation on defendant forthwith and file proof of service electronically.

**FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED

                                                                               /S/
                                                              LOIS BLOOM

Dated: May 23, 2014                                       United States Magistrate Judge
       Brooklyn, New York